IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

   Robin Pagan,                           Case No. 19-20047-beh

              Debtor.              Chapter 13

## DECISION AND ORDER ON GLOBAL LENDING SERVICES LLC'S OBJECTION TO PLAN CONFIRMATION

The questions presented here are of first impression in this Court. Does a Chapter 13 plan's special provision in section 8.1 alter the lien rights of a secured creditor from those rights initially set out in section 3.3 of the plan? In particular, does the special provision require the creditor to release its lien after the vehicle securing its claim has been totaled and the creditor receives payment from the insurance proceeds in the amount set forth in the debtor's plan to satisfy its claim? Relatedly, does the plan prohibit the secured creditor from applying the insurance proceeds to satisfy its claim as calculated under nonbankruptcy law—*i.e.*, with a higher interest rate than that provided in the plan? The relevant facts are undisputed and so the issues are questions of law.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 151, and the standing order of reference in this district. The matter is core, pursuant to 28 U.S.C. § 157(b)(2)(L). This decision constitutes findings of fact and conclusions of law, pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## FACTS

The debtor filed her petition for relief, schedules, and Chapter 13 plan of reorganization on January 3, 2019. ECF Nos. 1–2. Her Schedule D included a debt for $17,229.33 owed to Global Lending Services ("GLS") that was secured by the debtor's 2014 Chevrolet Malibu. ECF No. 1, at 18. GLS filed a proof of

claim in the amount of $17,272.33, disclosing that the vehicle was purchased within 910 days of the petition (*see* Claim No. 12-1, at 5), meaning that the debtor was required to treat GLS's claim as wholly secured in her Chapter 13 plan, regardless of the value of the collateral. *See* 11 U.S.C. § 1325(a) (hanging paragraph). The plan principally addressed GLS's debt in section 3.3, proposing to pay the full amount of the debt identified in the proof of claim at 6% interest over the course of the 60-month plan, for an estimated total payout of around $20,000. ECF No. 2, at 3. Section 3.3 of the plan also included the following prefatory language:

> The holder of any claim listed below as having value in the Amount of claim column will retain the lien on the property interest of the debtor(s) or the estate(s) until the earlier of:
>
> (a) payment of the underlying debt determined under nonbankruptcy law, or
>
> (b) discharge of the underlying debt under 11 U.S.C. § 1328, at which time the lien will terminate and be released by the creditor.

*Id.*[1]

The plan includes another provision, however, from which the parties derive their current dispute. Section 8.1—reserved for atypical plan provisions—provides:

> Creditors with secured claims shall retain their mortgage, lien or security interest in collateral until the earlier of (a) the payment in full of the secured portion of their proof of claim, or (b) discharge under 11 U.S.C. § 1328.

ECF No. 2, at 6. Global Lending Services did not object to the plan and it was confirmed on July 3, 2019. ECF No. 27.

---

[1] This language is part of the district's Chapter 13 model plan, which all debtors are required to use under Local Rule 3015(a), and mirrors the language of 11 U.S.C. § 1325(a)(5)(B)(i)(I): "Except as provided in subsection (b), the court shall confirm a plan if— . . . with respect to each allowed secured claim provided for by the plan— . . . the plan provides that the holder of such claim retain the lien securing such claim until the earlier of the payment of the underlying debt determined under nonbankruptcy law; or discharge under section 1328."

On September 19, 2021, the debtor submitted a request to modify her plan, explaining that the Malibu recently was involved in an accident and deemed a total loss by her insurer. ECF No. 86, at 2. The proposed modification would pay the remainder of GLS's secured claim in full as provided by the plan using the insurance proceeds, with the balance of the insurance proceeds to go to the debtor. *Id.* ("The insurance proceeds will be used to pay Global Lending Services['] secured claim in full for the 2014 Chevy Malibu. Any remaining insurance proceeds will be refunded to the Debtor (less administrative expenses).").

## ARGUMENTS OF THE PARTIES

Global Lending Services objected to confirmation of the modified plan, first focusing on the applicable interest rate. GLS argues that, as of the date of the accident, the contractual payoff amount under non-bankruptcy law[2] of $18,380.05 exceeded the value of the insurance proceeds, and thus all proceeds should be paid to/kept by GLS. ECF No. 88, at 2; No. 92, at 2. GLS clarified that the insurance company already had forwarded $17,957.30 in proceeds to GLS, and not to the Chapter 13 trustee. In an amended objection to confirmation, GLS pointed to an ambiguity between two terms in the confirmed plan: the model plan language in section 3.3 and the special provision in section 8.1. ECF No. 92, at 3. GLS also filed a motion to apply the entirety of the funds it received from the insurance company to satisfy its claim. ECF No. 91-1.

In response to GLS's motion, the debtor stated that, as of November 2021, the trustee had paid GLS $7,059.90 through the debtor's plan ($4,593.62 toward principal and $2,466.28 toward interest), leaving a remaining principal balance of $12,678.71, along with additional interest of $190.17 having accrued since the trustee's last disbursement. ECF No. 95, at 1. She wants to use the balance of the proceeds (which would total $5,088.42

---

[2] The proof of claim indicates the debtor purchased the vehicle for $17,894.81 on April 20, 2018 at an interest rate of 18.45%.

according to the numbers above) to purchase a new vehicle. *Id.* at 2. Addressing GLS's arguments about the interest rate and the tension between plan sections 3.3 and 8.1, the debtor asserts that GLS is bound by the clear terms of her confirmed plan, pursuant to 11 U.S.C. § 1327(a). The debtor first notes that the confirmed plan requires her to pay GLS's claim in full at 6.0% interest. She maintains that 11 U.S.C. § 1329(a) deprives GLS of standing to modify the plan by reverting back to the contractual interest rate under non-bankruptcy law. *Id.* at 2. Second, because GLS did not object to the confirmed plan, which includes a special provision that the debtor reads as requiring GLS to release its lien upon payment of its claim in accordance with the plan (the full amount identified in GLS's proof of claim at 6% interest), GLS should be deemed to have accepted that special provision under *In re Foley,* 606 B.R. 790, 795 (Bankr. E.D. Wis. 2019). ECF No. 95, at 3. In the debtor's reading, the special provision in section 8.1 "replaced the standard language in Section 3.3 about when a creditor must release its lien." *Id.* at 3.

Confronting dicta in *Foley,* Pagan contends that the special provision is neither vague nor ambiguous, and that the meaning of "the payment in full of the secured portion of their proof of claim" is clear. *Id.* at 4. She asserts that the meaning of "secured claim" is defined in § 506 and is uniformly used throughout the Bankruptcy Code. ECF No. 95, at 4. Pagan argues the plan obligates GLS to release its lien upon payment of its claim. *Id.*

At a hearing on these pending matters, counsel for GLS urged its view that the text of the special provision is vague, especially when compared to the text of section 3.3 of the plan. GLS asserts that because section 3.3 is (this district's) model plan language mirroring § 1325(a)(5)(B)(i)(I) of the Code and is unambiguous, that section should control the distribution of the insurance proceeds. The debtor maintains that the requirements of § 1325(a)(5)(B)(i)(I) are not binding here, because GLS accepted the plan under § 1325(a)(5)(A).

# DISCUSSION

## A. GLS's Nonbankruptcy Rights in the Insurance Proceeds

To secure the loan from GLS, the debtor granted GLS a security interest in her 2014 Chevrolet Malibu and "[a]ll money or goods received (proceeds) for the vehicle." Claim No. 12-1, at 6. Wisconsin's Uniform Commercial Code defines "proceeds," to include "insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral," but only "[t]o the extent of the value of collateral and to the extent payable to the debtor or the secured party." Wis. Stat. § 409.102 (1)(ps)(5).

When debtor Pagan's vehicle was damaged and her insurer deemed it a total loss, the insurer paid a benefit that it considered to be equal to the value of the vehicle. Neither party has disputed the equivalence of the insurance company's payment with the value of the collateral at the time of loss. The entire amount of the insurance payment therefore constitutes "proceeds" under Wis. Stat. § 409.102 (1)(ps)(5), and GLS's security interest extends to those funds under applicable nonbankruptcy law. GLS's rights in those proceeds, however, have been modified by the debtor's confirmed Chapter 13 plan.

## B. GLS's Rights in the Insurance Proceeds, as Modified by the Confirmed Plan

Section 1325 of the Bankruptcy Code sets forth the requirements for confirmation of a Chapter 13 plan. Subsection (a)(5) dictates the treatment of "each allowed secured claim provided for by the plan," and requires that one of three conditions must be satisfied before a plan may be confirmed: (1) the holder of the secured claim has accepted the plan, § 1325(a)(5)(A); (2) the debtor surrenders the property securing such claim to the secured creditor, § 1325(a)(5)(C); or (3) the plan meets the "cramdown" requirements of § 1325(a)(5)(B), which include that the holder of the secured claim retains the lien securing such claim until payment of the debt under nonbankruptcy law or discharge, § 1325(a)(5)(B)(i)(I).

As to the first option, the lack of objection by a creditor is tantamount to its acceptance. *See In re Bruce,* 610 B.R. 603, 605, 609 (Bankr. E.D. Wis. 2019)

("A confirmed Chapter 13 plan defines, and may alter, obligations between the debtor and creditors. . . . Provisions of a confirmed Chapter 13 plan bind the debtor and each creditor . . . whether or not the creditor has objected to, has accepted, or has rejected the plan.") (internal quotation marks omitted). Here, because GLS did not object to confirmation of the debtor's now-confirmed Chapter 13 plan, GLS is deemed to have accepted the plan within the meaning of § 1325(a)(5)(A). The question for the Court now is: "*What* did GLS accept?"

"A confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.,* 304 F.3d 753, 755 (7th Cir. 2002). Principles of contract law apply to interpreting a plan of reorganization. *In re Airadigm Commc'ns, Inc.,* 616 F.3d 642, 664 (7th Cir. 2010). The primary purpose of contract interpretation is to give effect to the objective intent of the parties, as manifest by the language used in the document. *Id.* (quoting *Solowicz v. Forward Geneva Nat'l, LLC,* 323 Wis. 2d 556, 780 N.W.2d 111, 124 (2010)). *See also In re Harvey,* 213 F.3d 318, 321–22 (7th Cir. 2000) (characterizing a confirmed plan as operating "like a court-approved contract or consent decree," and suggesting that "something analogous to the four-corners principle that applies to federal consent decrees ought to govern interpretation of plans confirmed by the bankruptcy court"); *U.S. v. Armour & Co.,* 402 U.S. 673, 682 (1971) ("[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it.").

If the language of the document is ambiguous on its face—meaning that it is susceptible to more than one reasonable interpretation—the Court may construe any ambiguities in the document against the drafter, under the doctrine of *contra proferentem.* "*Contra proferentem* is Latin for 'against the offeror,' and means that when 'interpreting documents, ambiguities are to be construed unfavorably to the drafter.'" *Wilson Mut. Ins. Co. v. Falk*, 2014 WI 136, 360 Wis. 2d 67, 85 n.7 (quoting *Black's Law Dictionary* 337 (9th ed.

2009)). *See also In re Daniels*, No. 94-20144, 2011 WL 3269650, at *5 (Bankr. E.D. Wis. Aug. 1, 2011) ("Generally, an ambiguous bankruptcy plan is to be construed against the debtor drafter."); *In re Lawhon*, No. 04-4129, 2005 WL 3704221, at *3 (Bankr. S.D. Ill. May 19, 2005) ("The debtors themselves drafted the plans and were obligated to state as clearly as possible the terms of their payment to creditors. Therefore, any ambiguity in this regard must be construed against the debtors.") (citing *In re Wickersheim,* 107 B.R. 177, 181 (Bankr. E.D. Wis. 1989)). This secondary rule of interpretation is "a rule of last resort, a 'tie-breaker' of sorts, that comes into play only when neither the extrinsic evidence nor other methods of construction can resolve the ambiguity." *Baker v. Am.'s Mortg. Servicing, Inc.*, 58 F.3d 321, 327 (7th Cir. 1995).

### 1. Lien retention under the plan

Here, the Court must interpret the following language of the debtor's plan:

> The holder of any claim listed below as having value in the Amount of claim column will retain the lien on the property interest of the debtor(s) or the estate(s) until the earlier of:
>
> (a) payment of the underlying debt determined under nonbankruptcy law, or
>
> (b) discharge of the underlying debt under 11 U.S.C. § 1328, at which time the lien will terminate and be released by the creditor.

ECF No. 2, at 3 (section 3.3). And:

> Creditors with secured claims shall retain their mortgage, lien or security interest in collateral until the earlier of (a) the payment in full of the secured portion of their proof of claim, or (b) discharge under 11 U.S.C. § 1328.

*Id.* at 6 (section 8.1).

The debtor asserts that these two provisions, when read together, clearly require GLS to release its lien after its claim is paid in accordance with the plan

($17,272.33, paid at 6% interest, for a total payment of approximately $20,000). GLS disagrees.

The *Foley* court considered the same special provision text as appears here, and though not necessary to its holding, found the language ambiguous. *See Foley*, 606 B.R. at 797–98 ("Given the identified ambiguity and likely ineffectiveness of the provisions here, the court would be within its rights to order the provisions stricken when confirming these plans.") (citing Fed. R. Civ. P. 12(f) ("The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.")). The court remarked: "It is not entirely clear what 'payment in full of the secured portion of their proof of claim' means." *Id.* at 797. After offering one possible interpretation—for secured claims covered by the hanging paragraph of § 1325(a), which prohibits the bifurcation of some "allowed secured claims" under § 506(a), the "secured portion of [those creditors'] proofs of claim" likely means "the entirety of that creditor's filed claim amount"—the court blamed the lack of clarity on the debtors' choice to eschew specificity, adding: "A more direct statement – perhaps identifying the specific secured creditor and a specific dollar amount upon payment of which the liens would be released – might be effective." *Id.*

Like the *Foley* court, this Court also finds the language of the debtor's special provision unclear. A comparison of terms in section 3.3 and section 8.1 of the plan highlights the ambiguity. In section 3.3 debtor identifies GLS as "[t]he holder of any claim listed below," but in section 8.1, the debtor refers generically to "[c]reditors with secured claims." In section 3.3 debtor uses the model plan language to describe the circumstances for lien retention, but in section 8.1 those circumstances are altered slightly, omitting "determined under nonbankruptcy law" and adding "payment in full of the secured portion of their proof of claim." GLS suggests that "if Section 8.1 of the Plan was meant to be the opposite of Section 3.3 of the Plan, the Debtor should have used much more specific language," such as, "payment of the underlying debt

determined under *bankruptcy* law," or "the payment in full of the secured portion of their proof of claim *as modified by the Chapter 13 plan.*" ECF No. 91-1, at 5 (emphasis in original).

Although the debtor asserts that "'[s]ecured claim' has the same definition that is found in § 506 and used throughout the Bankruptcy Code," ECF No. 95, at 4, section 506(a) does not cure the ambiguity. Section 506 (a)(1) provides that "[a]n allowed claim of a creditor secured by a lien on property . . . is a secured claim to the extent of the value of such creditor's interest in . . . such property," and "an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." In other words, under § 506(a), a claim is secured only to the extent of the value of the property on which the lien is fixed. Section 506(d) also uses the term "secured claim" ("[t]o the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void" in two circumstances), but the U.S. Supreme Court, in *Dewsnup v. Timm*, refused to give "allowed secured claim" as used in § 506(d) the same meaning as in § 506(a), instead defining the term "secured claim" in § 506(d) to mean a claim supported by a security interest in property, regardless of whether the value of that property would be sufficient to cover the claim. *See* 502 U.S. 410, 414–17 (1992). Finally, under the "hanging paragraph" of 11 U.S.C. § 1325(a), for purposes of § 1325(a)(5), section 506 does not apply to a claim if (1) the debt is secured by a purchase money security interest in a personal-use motor vehicle and was incurred within the 910-day period preceding the date of the filing, or (2) the debt is secured by "any other thing of value" and was incurred during the 1-year period preceding the date of filing. In short, the language of the Code does not compel a clear and unambiguous reading of the special provision term "the payment in full of the secured portion of [the secured creditor's] proof of claim." *Foley* supposed that the section 8.1 language "likely means the entirety of that creditor's *filed claim amount.*" 606 B.R. at 797 (emphasis added). That is a possible reading. But including a familiar, standard provision expressly directed to GLS, and

then adding a somewhat similar special provision, not expressly directed to GLS and without explaining whether or how it deviates from the earlier provision, creates ambiguity.[3]

Other courts have refused to give effect to a debtor's interpretation of a plan's special or general provisions at the expense of an objecting creditor, when the language at issue is not specific and express, and fails to provide "clear, open, and unambiguous notice" of the debtor's intent with respect to that creditor's claim. *See In re Reuland*, 591 B.R. 342, 351 (Bankr. N.D. Ill. 2018). In *Reuland*, the debtors, after successful completion of their plan payments, asserted that a provision in their plan had served to discharge non-priority but non-dischargeable tax debt owed to the IRS.[4] The language of the provision at issue provided, in relevant part:

> *General unsecured claims (GUCs).* All allowed nonpriority unsecured claims, not specially classified, including unsecured deficiency claims under 11 U.S.C. § 506(a), shall be paid, pro rata, . . . to the extent possible from the payments set out in Section D, but not less than 13 % of their allowed amount.

591 B.R. at 344.

After the debtors completed their plan payments and obtained their discharges, over $52,000 of the IRS's general unsecured claim remained unpaid. Although the debtors conceded that the tax debt was otherwise nondischargeable under 11 U.S.C. § 523(a)(1)(B)(ii), they argued that the debt had been discharged by virtue of the language in the provision quoted above, because "their plan provided for the debt and the IRS failed to object to or

---

[3] The instruction for section 8.1 states, in part: "Under Bankruptcy Rule 3015(c), nonstandard provisions must be set forth below. A nonstandard provision is a provision not otherwise included in the Official Form or deviating from it."

[4] Although the tax debt at issue was not entitled to priority because it was attributable to tax years that fell outside the three-year prepetition window of section 507(a)(8), the debt was nevertheless nondischargeable under section 523(a)(1)(B)(ii), because the debtors had filed the corresponding tax returns late, and within the two-year period preceding their petition date. *See* 11 U.S.C. § 523(a)(1)(B)(ii) ("A discharge . . . does not discharge an individual debtor from any debt . . . for a tax or a customs duty . . . with respect to which a return, or equivalent report or notice, if required . . .was filed or given after the date on which such return, report, or notice was last due, under applicable law or under any extension, and after two years before the date of the filing of the petition.").

appeal confirmation," relying on *United Student Aid Funds, Inc. v. Espinosa,* 559 U.S. 260 (2010). *Reuland,* 591 B.R. at 347. The IRS responded that *Espinosa* was inapplicable because the Reulands' plan did not contain any specific language purporting to discharge the tax debt. *Id.*

The bankruptcy court agreed with the IRS. The court distinguished *Espinosa* and the other case on which the debtors relied—*Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee),* 193 F.3d 1083 (9th Cir. 1999)—pointing out that both of those cases involved plans with specific language that provided for the discharge of otherwise nondischargeable student loan debt. *See Reuland,* 591 B.R. at 349–50 ("Fundamental to each case was the fact that the debtor's plan contained a specific provision regarding the discharge of the student loan debt and the creditor had received notice of the contents of the plan"). The debtors' plan, in contrast, was "silent as to the dischargeability of the debt at issue." *Id.* at 349. The court concluded:

> Without any specific language in the Reulands' plan impairing the rights of the IRS, it is unreasonable to expect that the IRS would object to the plan—especially in light of the fact that nearly all plans contain a similar provision about general unsecured claims. The boilerplate provision about the percentage at which general unsecured claims will be paid through the plan cannot be construed to discharge otherwise nondischargeable debt. Absent express, specific language that provides for the discharge of such debt, the Court will not interpret a plan to do so after the fact.

*Id.* at 351–52.[5]

Similar to the provision in the Reulands' plan that broadly addressed all general unsecured claims, the nonstandard provision in Pagan's plan addresses all "[c]reditors with secured claims." ECF No. 2, at 6. In contrast, section 3.3 of Pagan's plan specifically identifies and specifies the treatment of

---

[5] Several other courts have expressed concern that "boilerplate" or frequently-used special provisions impede clarity and jeopardize judicial efficiency. *See, e.g., Foley,* 606 B.R. at 797; *In re Carlton,* 437 B.R. 412, 428–29 (Bankr. N.D. Ala. 2010) ("Probably the most compelling argument . . . against confirmation of the [special p]rovisions is the countless variations among similar provisions that inevitably will be scripted into chapter 13 plans by a bevy of debtors' attorneys in different bankruptcy courts throughout the country."); *In re Duke,* 447 B.R. 365, 371 (Bankr. M.D. Ga. 2011) (quoting *Carlton*).

GLS's claim: to be paid at 6.0% interest "under the plan," with GLS retaining its lien until discharge or payment of the claim under non-bankruptcy law, whichever is earlier. *Id.* at 3.[6]

Regardless of the intent the debtor now asserts is behind section 8.1 of the plan, the special provision text falls short of unambiguously conveying the debtor's desired message. Because this ambiguity should be construed against the debtor as drafter of the plan, the Court will not interpret the confirmed plan as compelling GLS to release its lien earlier than required under section 3.3 of the plan—"(a) payment of the underlying debt determined under nonbankruptcy law, or (b) discharge of the underlying debt under 11 U.S.C. § 1328." *Cf.* 11 U.S.C. § 1325(a)(5)(B)(i)(I).

---

[6] Without express, specific language in debtor Pagan's special provision clearly describing her intention to force GLS to release its lien earlier than otherwise provided under section 3.3 of the plan, it cannot be said that the special provision gave GLS sufficient notice of such potential treatment of its claim, and that GLS waived its right to object, or is barred from doing so now in the circumstances. This case is therefore unlike the situation presented in *In re Harvey*, 213 F.3d at 331-33, where the Seventh Circuit concluded that a creditor who had notice of ambiguities in a debtor's proposed Chapter 13 plan should have objected before the plan was confirmed, and consequently waived the right to raise such arguments after confirmation. The Seventh Circuit recognized the "well-established principle of bankruptcy law that a party with adequate notice of a bankruptcy proceeding cannot ordinarily attack a confirmed plan," as well as the general rule that "a party in contract litigation must raise all claims—including those related to ambiguity—during the first litigation concerning that contract." *Id.* at 331-32. At the same time, however, the *Harvey* court acknowledged exceptions to those rules:

> We do not mean to suggest that a party may never claim in a subsequent proceeding that a provision of a Chapter 13 plan is ambiguous and should be read one way or another. It may be the case that an approved plan contains a term that raises an unexpected problem at some point in the future. No party to a bankruptcy plan confirmation proceeding can be expected to envision every foreseeable circumstance that could require a court to construe a particular plan provision.

*Id.* at 323. *See also Case v. Wells Fargo Bank, NA*, 394 B.R. 469, 476 (Bankr. E.D. Wis.), *aff'd sub nom. Ruhl v. HSBC Mortg. Servs., Inc.*, 399 B.R. 49 (E.D. Wis. 2008) ("There are some recognized exceptions to the rule that an order confirming plan is binding. . . . An exception to *res judicata* also exists where fraud is involved. . . . Further exceptions to *res judicata* arise where there is a lack of due process caused by a failure to provide notice of a proposed plan to creditors, where a plan is ambiguous, or where a plan contains a term that raises an unexpected problem at some time in the future") (citing, *inter alia*, *Harvey*, 213 F.3d at 323).

### 2. Applicable interest rate

The second issue for the Court to decide is whether, as GLS argues, GLS is entitled to the full insurance policy payout now, prior to completion of the debtor's plan, to apply toward its claim as calculated under non-bankruptcy law ($17,272.33 as of the petition date, with interest accruing at 18.45%, resulting in a contractual payoff of $18,380.05 as of the date of the vehicle's loss). Because GLS has received $7,059.90 from the trustee on account of its claim, if GLS were allowed to retain the entirety of the insurance proceeds ($17,957.30), the total payment on account of its claim would exceed $25,000—much more than the debtor's confirmed plan proposes to pay by virtue of its 6% interest rate. The debtor argues that GLS is not entitled to this higher payment in satisfaction of its claim, asserting, *inter alia*:

> Pursuant to § 1327(a), the confirmation of the Debtor's plan binds both the Debtor and GLS according to the terms of Section 3.3 of the plan. GLS is entitled to the full amount of its secured claim and is to be paid at 6.00% interest. . . .
>
> Once GLS's secured claim is paid in full, with 6.00% interest, it is not entitled to any additional funds so long as either the Debtor's chapter 13 plan is on-going or the Debtor has completed the plan and obtained a discharge under § 1328(a).
>
> . . .
>
> Section 3.3 reduces the interest that GLS is allowed to collect on its principal balance to 6.00%. . . . Even without the Special Provision, GLS would not be entitled to the Insurance Proceeds above its remaining principal balance, plus accrued interest at 6.00%, unless or until the Debtor's case was dismissed or converted.

ECF No. 95, at 2–3.

On this much, the debtor is correct. The interest rate on GLS's claim, as modified by the debtor's confirmed plan, has been reduced to 6%. GLS had notice of this unambiguous plan term and failed to object to confirmation, so GLS is bound by the terms of the plan and is not entitled to satisfy its claim at a higher interest rate while this case is pending. GLS therefore cannot keep

and apply the full amount of the insurance proceeds currently in its possession.

The debtor adds: "At most, GLS could insist that the excess Insurance Proceeds be held in trust until the granting of the Debtor's discharge to see if it is able to enforce its lien rights against the Insurance Proceeds." *Id.* at 3. GLS acknowledged that retaining the excess proceeds in trust until discharge is reasonable. The Court agrees. If debtor completes her plan payments and receives a discharge, *then* GLS will be required to release its lien on the remaining insurance proceeds in accordance with the debtor's confirmed plan. Until that time, GLS is entitled to retain its secured interest in the proceeds under nonbankruptcy law. If, for whatever reason, the debtor fails to obtain her discharge, a requirement that the insurance proceeds be held in trust will have preserved GLS's secured interest in those proceeds, and therefore its rights under nonbankruptcy law.

The *In re Norred* court took this same approach. It found that the debtor's plan bound the car creditor to payment of its claim at the rate provided in the plan in exchange for the creditor's ability to retain the lien until the debtor received a discharge. No. 09-40186-ELP13, 2011 WL 4433598 at *4 (Bankr. D. Or. Sept. 21, 2011). "In order to protect the interest of [the car creditor], the trustee shall hold the insurance proceeds that exceed the amount paid to [it] on its secured claim until the debtors obtain a discharge. Upon discharge, the trustee shall pay the remaining proceeds to unsecured creditors pursuant to the plan. If debtors do not complete their plan and obtain a discharge, [the creditor] will be entitled to the excess proceeds." *Id.*

Here, the Court concludes that the appropriate distribution of the insurance proceeds under the terms of the debtor's confirmed plan is as follows:

GLS may retain an amount of proceeds sufficient to pay of the remainder of its claim as modified by the debtor's plan (which, according to the debtor,

was $12,678.71 plus any accrued interest calculated at 6%, as of November 16, 2021).

GLS shall convey the remainder of the insurance proceeds to the Chapter 13 trustee to hold in trust until the debtor either receives a discharge, or her case is dismissed. In the event of the former, GLS shall release its lien in the remaining proceeds, which then will be distributed in accordance with other applicable plan and Code provisions. In the event of the latter, GLS will be entitled to the excess proceeds.

## CONCLUSION AND ORDER

For the foregoing reasons,

IT IS HEREBY ORDERED that Global Lending Services' objection to the debtor's motion to modify her confirmed Chapter 13 plan is **SUSTAINED.**

IT IS FURTHER ORDERED that Global Lending Services' motion to apply the insurance proceeds to its claim is **GRANTED in part** as directed above.

Dated: January 24, 2022

By the Court:

_____
Beth E. Hanan
United States Bankruptcy Judge